2017V00023/BAW/ms

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. |
| v. | : | Civil Action. No. |
| $3,415,000 IN U.S. CURRENCY, | : | VERIFIED COMPLAINT |
| | | FOR FORFEITURE IN REM |
| Defendant in rem. | : | |

Plaintiff, the United States of America (the "Government"), by its attorneys, William E. Fitzpatrick, Acting United States Attorney for the District of New Jersey, and Sandra Moser, Acting Chief, Department of Justice, Criminal Division, Fraud Section, for its verified complaint (the "Complaint") alleges, upon information and belief, as follows:

## I.    NATURE OF THE ACTION

1.    This action is brought by the Government seeking forfeiture of $3,415,000 in U.S. Currency (the "Defendant Property").

## II.    JURISDICTION AND VENUE

2.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

3.    Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the District of New Jersey.

4.      The Defendant Property is on deposit in an account at TD Bank in Branchburg, New Jersey.

### III.    RELEVANT INDIVIDUALS AND ENTITIES

5.      **Spectra Gases, Inc.** ("Spectra Gases").  Spectra Gases, a privately held New Jersey corporation until 2006, was involved in the production and distribution of industrial, medical, and specialty gases, including ultra-pure isotopes of gases such as boron.

6.      **Linde North America Inc.**  In October 2006, Linde Gas North America LLC, a U.S. subsidiary of Linde North America Inc. (collectively, "Linde") acquired Spectra Gases and maintained it as a wholly-owned subsidiary until on or about January 2010, when it dissolved Spectra Gases and became its successor in interest. Linde is a manufacturer and supplier of industrial, specialty, and medical gases and related equipment that is headquartered in Murray Hill, Union County, New Jersey.

7.      **National High Technology Center ("NHTC").**  The NHTC was based in Tbilisi, Republic of Georgia, and specialized in the production of rare and specialty gases, including boron-11, an isotope of boron. At all times relevant to this Complaint, the NHTC was 100% owned and controlled by the Republic of Georgia ("Georgia").  Employees of the NHTC were "foreign officials" within the meaning of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1, *et seq.*

8.      **Far Point Ventures, Inc. ("Far Point").**  Far Point was a shell corporation incorporated in Belize in or about March 2002. Far Point was

- 2 -

owned and controlled, directly and indirectly, by two high-level officials at the NHTC and a third-party intermediary with close connections with those officials (collectively the "NHTC Officials").

9.    ***Transcontinental, Ltd. ("Transcontinental").***  Transcontinental was a shell corporation incorporated in Belize in or about April 2006. Transcontinental was owned and controlled, directly and indirectly, by the NHTC Officials.

10.    ***Spectra Investors, LLC ("Spectra Investors").***  Spectra Investors was a New Jersey limited liability company formed in 2006 in connection with Spectra Gases' purchase of income-producing boron assets from the NHTC. Spectra Gases owned 49% of Spectra Investors and Transcontinental owned the remaining 51% of the company.

11.    ***Spectra Gases Georgia.***  Spectra Gases Georgia, a Georgian company that was wholly owned by Spectra Investors, was formed in connection with the purchase of the income-producing boron assets from the NHTC.

### IV.    BASIS FOR FORFEITURE

12.    From approximately November 2006 to approximately December 2009, Linde, through Spectra Gases, made corrupt payments to the NHTC Officials in connection with Spectra Gases' purchase and operation of certain income-producing assets that were privatized by the Republic of Georgia in 2006.

13.     Specifically, on or about November 13, 2006, Spectra Gases, through Spectra Investors, purchased from the NHTC a column for the production of highly purified boron gas, known as 11BF3 (boron-11 triflouride), and related machinery, equipment, and expertise.

14.     In advance of the boron column purchase and prior to Linde's acquisition of Spectra Gases, three high-level executives who were the principal shareholders and managers of Spectra Gases (the "Spectra Executives"), and who continued to manage Spectra Gases for three years following Linde's acquisition pursuant to a so-called "Earn-Out" arrangement, agreed to share the revenues earned from the sale of the boron gas with the NHTC Officials in return for the NHTC Officials' use of their official positions to assist Spectra Gases in being selected as the purchaser of the boron column from the NHTC (which agreement followed a previous corrupt arrangement between the same parties for a similar purpose).

15.     In order to effectuate this corrupt agreement and funnel monies to the NHTC Officials, the Spectra Executives and the NHTC Officials agreed to form, and did form, two new companies, Spectra Investors, which purchased the boron column from the NHTC, and Spectra Gases Georgia, which was wholly owned by Spectra Investors and was the company through which the boron column was operated.

16.     Neither the asset purchase agreement nor any other document accompanying the acquisition of the boron column disclosed the personal

financial stake of the NHTC Officials or the NHTC Officials' connection with the shell companies they controlled.

17.    In order to provide the NHTC Officials with a larger share of the revenues generated by the sale of the boron gas, the Spectra Executives and the NHTC Officials, through Spectra Investors, entered into a separate "management agreement" (the "Management Agreement") with Far Point. Pursuant to the Management Agreement, Far Point purportedly provided management services to Spectra Investors and Spectra Gases Georgia in exchange for 49% of the gross profits from the sale of the boron.  There is no evidence, however, of Far Point performing any services for or on behalf of Spectra Gases Georgia or Spectra Investors.

18.    After the "management" payments were made to Far Point, the remaining revenues were distributed to Transcontinental and Spectra Gases in accordance with the parties' respective ownership interests in Spectra Investors: 51% to Transcontinental and 49% to Spectra Gases.  The net result of these arrangements was that the NHTC Officials received approximately 75% of the profits generated by the boron column, and Spectra Gases received approximately 25% of the profits.

### V.    THE DEFENDANT PROPERTY

19.    All of the funds on deposit in the Spectra Investors bank account, which was held at Commerce Bank in Branchburg, New Jersey (the "Spectra Investors Account"), were proceeds received as a result of the scheme to violate of the Foreign Corrupt Practices Act and property involved in the associated

money laundering transactions. The corrupt agreements entered into by the Spectra Executives and the NHTC Officials and the entities they owned and controlled, directly or indirectly, provided that certain distributions be made from the Spectra Investors Account, including:

(a) $1,492,000 to Transcontinental in respect of its 51% interest in Spectra Investors for the period from January 1, 2010 through March 31, 2010;

(b) $1,160,000 to Far Point for its purported "management services" for the period from January 1, 2010 through March 31, 2010; and

(c) $762,526.82 to Spectra Gases Georgia, representing amounts purportedly due as reimbursement for costs associated with Spectra Gases Georgia's production of 11BF3 gas for the period beginning August 27, 2010.

20. Upon discovering the misconduct, Linde, which at that time controlled the Spectra Investors Account, did not make the upcoming distributions called for by the corrupt agreements and instead withheld the monies described in paragraphs 19(a) through (c) above, on the basis that they were likely the proceeds of crime or were to be transferred in order to promote and further a corrupt scheme.

21. The Government took steps during its investigation to toll the statute of limitations and thus, the five-year limitations period does not expire until in or around August 2018.

22. The Defendant Property is a sum of money constituting or derived from, directly or indirectly, the funds in the Spectra Investors Account described in paragraphs 19-20 above.

## VI.    FIRST CLAIM FOR FORFEITURE

23.    Plaintiff repeats, realleges and incorporates by reference herein each and every allegation contained in paragraphs one through twenty-two of this Verified Complaint.

24.    The Defendant Property is subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in money laundering transactions and attempted money laundering transactions, in violation of 18 U.S.C. §§ 1956 and 1957, and as property traceable to such property.

25.    Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of . . . section 1956 or 1957 of this title [relating to money laundering], or any property traceable to such property, is subject to forfeiture to the United States."

26.    18 U.S.C. § 1956(a)(1) imposes a criminal penalty upon any person who,

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity
>
> (A)    (i) with the intent to promote the carrying on of specified unlawful activity; or
>
>         . . . or
>
> (B)    knowing that the transaction is designed in whole or in part
>
>         (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

- 7 -

. . .

27.    Section 1956(a) further imposes a criminal penalty upon any

person who:

> (2) . . . transports, transmits, or transfers, or attempts to
> transport, transmit, or transfer a monetary instrument or funds
> from a place in the United States to or through a place outside the
> United States or to a place in the United States from or through a
> place outside the United States
>
> (A)  with the intent to promote the carrying on of specified unlawful
> activity; or
>
> (B)  knowing that the monetary instrument or funds involved in the
> transportation, transmission, or transfer represent the proceeds of
> some form of unlawful activity and knowing that such
> transportation, transmission, or transfer is designed in whole or in
> part
>
>> (i) to conceal or disguise the nature, the location, the
>> source, the ownership, or the control of the proceeds of
>> specified unlawful activity; or
>
> . . .

28.    Section 1956(f) provides that:

There is extraterritorial jurisdiction over the conduct prohibited by
this section if

> (1)  the conduct is by a United States citizen or, in the
> case of a non-United States citizen, the conduct occurs in
> part in the United States; and
>
> (2)  the transaction or series of related transactions
> involves funds or monetary instruments of a value exceeding
> $10,000.

29.    Title 18, United States Code, Section 1956(h) provides that "[a]ny

person who conspires to commit any offense defined in this section shall be

guilty of a crime."

30.    Title 18, United States Code, Section 1957 provides, in pertinent part, that "[w]hoever . . . knowingly engages or attempts to engage in a monetary transaction [in the United States] in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity" shall be guilty of a crime. A "monetary transaction" includes "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . . by, through, or to a financial institution . . ." 18 U.S.C. § 1957(f)(1).

31.    For purposes of Sections 1956 and 1957, a specified unlawful activity is defined in 18 U.S.C. § 1956(c)(7), and includes "any felony violation of the Foreign Corrupt Practices Act." 18 U.S.C. § 1956(c)(7)(D).

## VII.    SECOND CLAIM FOR FORFEITURE

32.    Plaintiff repeats, realleges and incorporates by reference herein each and every allegation contained in paragraphs one through thirty-one of this Verified Complaint.

33.    The Defendant Property is further subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), as property constituting or derived from proceeds traceable to a felony violation of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1, *et seq.*

34.    Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting specified unlawful activity (as defined in Section 1956(c)(7)

of [title 18]), or a conspiracy to commit such offense, is subject to forfeiture to the United States."

35.     For purposes of Section 981(a)(1)(C), "specified unlawful activity" includes a felony violation of the Foreign Corrupt Practices Act.

36.     Title 18, United States Code, Section 981(a)(2)(A) provides, in pertinent part, that:

> In cases involving . . . unlawful activities . . . the term "proceeds" means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense.

37.     Title 28, United States Code, Section 1355(b)(1)(A) provides that a forfeiture action or proceeding may be brought in "the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred."

WHEREFORE, plaintiff United States of America prays that process be issued to seize and enforce the forfeiture of the Defendant Property and that all persons having an interest in the Defendant Property be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant Property to the United States of America for disposition according to law, and that this Court grant plaintiff such further

relief as this Court may deem just and proper, together with the costs and

disbursements of this action.

Dated:  Newark, New Jersey
            June 16, 2017

                                WILLIAM E. FITZPATRICK
                                ACTING UNITED STATES ATTORNEY
                                DISTRICT OF NEW JERSEY


                    By:    s/Barbara A. Ward
                                BARBARA A. WARD
                                JACOB ELBERG
                                ASSISTANT UNITED STATES ATTORNEYS



                                SANDRA MOSER, ACTING CHIEF
                                U.S. DEPARTMENT OF JUSTICE
                                CRIMINAL DIVISION, FRAUD SECTION


                    By:    s/Laura N. Perkins
                                LAURA N. PERKINS, ASSISTANT CHIEF
                                NICHOLAS ACKER, SENIOR TRIAL ATTORNEY

# **VERIFICATION**

STATE OF NEW JERSEY      )
COUNTY OF ESSEX        : ss.:
DISTRICT OF NEW JERSEY   )

Edgar W. Koby, being duly sworn, deposes and says that he is a Special

Agent with the Federal Bureau of Investigation; that he has read the foregoing

Verified Complaint; and that the statements contained therein are true to the

best of his knowledge, information, and belief.

The sources of deponent's information and the ground of his belief

include official records and files of the United States, information obtained

directly by the deponent, and information obtained by other law enforcement

officials and representatives during an investigation of alleged violations of

Titles 15 and 18, United States Code.

EDGAR W. KOBY
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
this 16th day of June, 2017
at Newark, New Jersey

Jaclyn Wyrwas
Attorney-at-Law of the State of New Jersey